Filed 12/16/14  In re Andrea H. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Andrea H., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>TREVOR H.,<br><br>          Defendant and Appellant. | A141859<br><br>(Napa County<br>Super. Ct. No. JV17220) |

The juvenile court terminated the parental rights of Andrea H.'s mother (Mother)[1] and father, Trevor H. (Father).  (Welf. & Inst. Code, § 366.26.)[2]  Father appeals from that order, arguing that the court erred in determining the beneficial relationship exception inapplicable.  We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition and Detention Order*

In August 2012, when Andrea was four years old, the Napa County Health and Human Services Agency (Agency) filed a juvenile dependency petition, which alleged that Andrea had suffered, or was at substantial risk of suffering, serious physical harm

---

[1] Mother is not a party to this appeal.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

(§ 300, subd. (b)) as a result of her parents' domestic violence and substance abuse. Specifically, it was alleged that Father had been arrested for assaulting Andrea's paternal grandmother. Andrea lived with Father and the paternal grandmother and witnessed the assault.[3] The petition also alleged that Father had a history of volatile moods, had admitted using methamphetamines, and that Mother and Father had a history of domestic violence. The Agency also alleged that Mother and Father left Andrea with no provision for support (§ 300, subd. (g)). Father was incarcerated and Mother's whereabouts were unknown.

Andrea was ordered detained out of Father's custody. Father was permitted two hours of supervised visitation each week.

*Jurisdiction Report and Determination*

The jurisdiction report indicated that Andrea had been placed in the home of her maternal aunt. Andrea reported that she saw Father and the paternal grandmother fighting. According to the paternal grandmother's report to police, Father reportedly choked her until she lost consciousness, then knocked her down and stomped on her chest. Father, on the other hand, stated that the incident had been "blown out of proportion." He reported that the paternal grandmother was frustrated with him for being out of work. He denied assaulting her. He admitted using methamphetamine. Mother also reported that Father had assaulted her and threatened to beat her up if she attempted to see Andrea.

At the jurisdiction hearing, Father agreed to submit on the petition. Accordingly, the court sustained the petition and adjudged Andrea "a child as described under [section 300, subdivisions (b) and (g)]." Father was declared Andrea's presumed father.

*Disposition Report and Hearing*

The social worker noted, in the disposition report, that at times Andrea was afraid of Father. Andrea told the social worker that she would rather live with her maternal aunt

---

[3] The Agency also alleged that two of Andrea's half-sisters were previously removed from Father's custody. They had been placed under a plan of family maintenance with their mother.

2

and Mother, but loved Father and liked visiting him in jail. Father conceded that his actions put Andrea at risk and he wanted to make changes to improve his parenting abilities. He stated that his biggest challenge would be dealing with his substance abuse. Father was observed to be "engaging and appropriate" during his weekly 30 minute visit with Andrea. The Agency recommended that Andrea be removed from her parents' custody and that both Mother and Father be provided with reunification services.

At the uncontested disposition hearing, the court declared Andrea a dependent of the court and placed her in the Agency's custody, with contemplated relative placement. With respect to reunification, the court ordered Mother and Father to participate in counseling or therapy related to domestic violence and parenting, complete drug and alcohol assessments and comply with all recommendations, attend a minimum of three 12-step meetings per week, and submit to random drug testing.

*Six-Month Review Hearing*

In the six-month review report, the Agency reported that Andrea remained in placement with her maternal aunt, where she was "very comfortable and happy." Father was making some progress with his case plan. He had been released from custody, had returned to work, and had begun taking psychotropic medication for bipolar disorder. But Father had not developed a domestic violence prevention plan, he had missed drug/alcohol counseling sessions and 12-step meetings, and he failed to drug test regularly. Following an agreement between the parties, the juvenile court ordered additional services for both Mother and Father up to the 12-month period.

*12-Month Review Hearing*

In the 12-month review report, the Agency recommended termination of reunification services for both parents. Both Mother and Father continued to have difficulty with substance abuse issues. Father was reincarcerated for a probation violation in July 2013. Father was also found drunk in public, and he had missed a number of drug tests, tested positive for alcohol and marijuana, and admitted to using methamphetamine. Father had recently re-enrolled in a drug treatment program. Father

3

had visited consistently with Andrea and was observed to be affectionate.  Andrea was doing well in her placement with the maternal aunt.

Father did not appear at the review hearing, and his attorney advised the court that Father had "given up" and moved out of the area.  The matter was submitted on the social worker's report.  The juvenile court found that Andrea could not be returned home, terminated the reunification services of both parents, and set the matter for a permanency hearing.  Supervised visits were reduced to once per month.

*Section 366.26 Report and Hearing*

The Agency's section 366.26 report recommended termination of parental rights and adoption as Andrea's permanent plan.  Andrea continued to do well with the maternal aunt, who wished to adopt her.  Andrea was healthy and developmentally on target.  The adoptions assessment report indicated that Andrea was generally adoptable and had indicated a preference for staying with her maternal aunt if she could not be returned to her parents.

With respect to visitation, it was observed that Father's visitation had been "sparse and inconsistent," with half of his visits occurring during periods of incarceration.  However, the social worker wrote:  "[Andrea] was observed to readily go towards each parent and appeared to enjoy being with them.  The parents appeared to engage well with the child and engaged in appropriate play, such as reading and drawing.  Although the parents engaged well during their visitations, the lack of frequent and consistent visitation is a clear barrier to maintaining and building upon their relationship.  Since . . . the parents' services were terminated, the parent's [*sic*] have not attended any of the scheduled monthly visitations.  The [maternal aunt] has stated that this upsets the child, and she is clearly disappointed."  Neither parent had visited or called Andrea at all after the 12-month review hearing.

The Agency's report indicated that from the time of the 12-month review hearing Father had been arrested and cited for resisting arrest and fleeing from police.  Father also had been arrested for petty theft, shoplifting, and driving on a suspended license.  At the contested section 366.26 hearing, Father testified that he was currently incarcerated, but

4

had previously left town to take a job in Ukiah for six months and did not visit or call Andrea during that period.  Father also testified that he felt there was a beneficial relationship because he loved Andrea and had cared for her before removal.  The paternal grandmother also testified that Father was Andrea's primary caregiver when they lived in her home.  She said, "They love each other.  They have a great relationship."  In her opinion, it would be detrimental to terminate Father's parental rights.

Father cross-examined social worker, Gusto Curtis.  Curtis testified that the visitation notes indicated that Andrea would jump into Father's arms, and tell him " 'I love you.' "  Curtis said "[Father and Andrea] have a positive relationship while they're visiting together."  However, Curtis also testified that "toward the end, [Andrea] became distraught about visitation, because she had been let down so much."  When asked if she wanted to return to Mother's or Father's care, she only mentioned Mother.

The Agency recommended termination of parental rights.  Father did not contest that Andrea was adoptable but argued that the beneficial relationship exception applied.  The juvenile court concluded notice had been given as required by law, found it likely that Andrea would be adopted, found Father failed to meet his burden to establish the beneficial relationship exception, and terminated Mother's and Father's parental rights.  The court explained:  "When I look at the notes and I read what was happening in the visits, they appear to be play dates to me.  I didn't see where Andrea was looking to her father to care for her needs in any way. . . . [¶] And what I've heard is that she loves her father . . . .  But when I have to consider whether or not there is a beneficial relationship, it's what will happen if she doesn't talk to her father, see her father . . . .  What if they don't have that contact?  Will it be detrimental to her? [¶] Well, for a period of three or four months she didn't have that contact, and apparently she was just fine. . . . [¶] . . . [¶] I also have to consider the fact that these visits were all supervised, and at no point did it proceed to monitored or even unsupervised."  Father filed a timely notice of appeal.

## II.    DISCUSSION

"Adoption, where possible, is the permanent plan preferred by the Legislature. [Citation.]"  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)  "[I]n order

5

to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. . . . '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' [Citation.]" (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250; accord, § 366.26, subd. (c).)

Thus, at a section 366.26 hearing, "[a] finding . . . under Section 366.21 or 366.22, that the court has continued to remove the child from the custody of the parent . . . and has terminated reunification services, shall constitute a sufficient basis for termination of parental rights. Under these circumstances, the court shall terminate parental rights unless . . . : [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he burden is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce that evidence. [Citation.]" (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.) "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Father contends that the order terminating parental rights must be reversed because the juvenile court erred in finding the beneficial relationship exception inapplicable. We disagree.

Appellate courts have routinely applied the substantial evidence rule when reviewing a juvenile court's determination that an exception to termination did not apply. (See *In re B.D.* (2008) 159 Cal.App.4th 1218, 1235; *In re Dakota H.* (2005)

6

132 Cal.App.4th 212, 228; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947; *Autumn H., supra*, 27 Cal.App.4th at pp. 576–577.)  However, Division Three of this court has held that abuse of discretion is the proper standard.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*).)

A third standard of review has been articulated by the Sixth District, in *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528 and *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1317 (*Bailey J.*), and adopted by the Second District in *In re K.P.* (2012) 203 Cal.App.4th 614, 622.  The court undertakes a two prong analysis in determining the application of the beneficial relationship exception.  The first prong is whether the parent has maintained regular visitation and contact with the child.  The second is whether a sufficiently strong bond exists between the two, such that the child would suffer substantial detriment from its termination.  (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449–450.)  The Sixth District has said that the first determination is, because of its factual nature, properly reviewed for substantial evidence.  (*Bailey J.,* at p. 1314.)  But, the second prong analysis "is based on the facts but is not primarily a factual issue.  It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]  Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies."  (*Id.* at p. 1315, italics omitted.)  We believe the result would be the same in this case under an abuse of discretion standard, a substantial evidence standard, or the standard articulated in *I.W.* and *Bailey J.*  The practical differences between the standards are "not significant," as all three give deference to the juvenile court's judgment.  (See *Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

Here, substantial evidence demonstrates that Father did not maintain regular visitation and contact with Andrea.  At the beginning of this dependency proceeding, and while Father was incarcerated, he did consistently attend weekly supervised visits with Andrea.  However, when it became likely that Father's services would be terminated, he

did not visit or contact Andrea at all for a period in excess of several months. This is substantial evidence that Father did not meet the first prong of the beneficial relationship exception. (*In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["[s]poradic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].)

But, even if we assume that the first prong of section 366.26, subdivision (c)(1)(B)(i) has been met, we nonetheless conclude that the juvenile court did not abuse its discretion, or make a finding unsupported by substantial evidence, in determining the exception inapplicable. The juvenile court reasonably found that Andrea did not have a parental relationship with Father that necessitated preservation at the expense of depriving her of the permanency of adoption.

"Under section 366.26, subdivision (c)(1)(B)(i), parental rights cannot be terminated where the juvenile court 'finds a compelling reason for determining that termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' The exception does not require proof the child has a 'primary attachment' to a parent or the parent has 'maintained day-to-day contact' with the child. [Citation.] [¶] The exception's second prong requiring that 'the child would benefit from continuing the [parent-child] relationship' means that 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.] The juvenile court 'balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.] [¶] 'The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect

of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond.' [Citation.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 123–124 [relying on, inter alia, *Autumn H., supra*, 27 Cal.App.4th at pp. 575–576].)

"While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.) "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact. . . . A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) The exception "appl[ies] to situations where a dependent child benefits from a continuing parental relationship; not one . . . when a parent has [loving and] frequent contact with but does not stand in a parental role to the child." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420.)

There is evidence in the record of a loving and positive attachment between Andrea and Father. Andrea says that she loves Father and the two are affectionate and playful during visits. Father did take care of Andrea's daily needs before she was removed from his custody. But at the time parental rights were terminated, Andrea was five years old and had lived away from Father for over 18 months. Father had never

9

progressed to unsupervised visits with Andrea, and his substance abuse remained unresolved. There was nothing more than conclusory testimony from the paternal grandmother that termination of parental rights would be detrimental to Andrea. Andrea may have been disappointed when Father stopped visiting, but the record contains no evidence that she suffered emotional distress when separating from Father. On the other hand, the prospective adoptive parent could provide Andrea with consistency, stability, affection, and responsiveness to her emotional needs.

Father relies on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) and *In re Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*), in which orders terminating parental rights were reversed because the juvenile court erroneously determined that the beneficial relationship exception did not apply. The social services agency in *S.B.* reported the father had " 'complied with every aspect of his case plan,' including maintaining his sobriety and consistently visiting S.B." (*S.B.*, at p. 293.) Nonetheless, the father's reunification services were terminated because the social worker opined that the father's physical and emotional health prevented him from reunifying with S.B. (*Ibid.*) The father had maintained supervised visits with S.B. three times a week. S.B. became upset when the visits ended and wanted to leave with the father. The father " 'demonstrate[d] empathy and the ability to put himself in his daughter's place to recognize her needs.' " (*Id.* at p. 294.) A bonding study revealed that the bond between father and daughter was " 'fairly strong.' " (*Id.* at p. 295.) During the study's observed visits, S.B. sat in the father's lap, played games, and colored. "In the middle of coloring, S.B. [told the father], 'I love you,' and he responded in kind. S.B. whispered and joked with [the father] and then spontaneously said, 'I wish I lived with you and Mommy and Nana.' " (*Ibid.*) The juvenile court found that the beneficial relationship exception did not apply and terminated parental rights. (*Id.* at p. 296.)

On appeal, the reviewing court concluded "there [was] no evidence to support the court's finding [the father] did not have some type of parental relationship with S.B." (*S.B., supra*, 164 Cal.App.4th at p. 298.) The appellate court observed: "As we recognized in *Autumn H.*, [a parental] relationship typically arises from day-to-day

10

interaction, companionship and shared experiences, and may be continued or developed by consistent and regular visitation after the child has been removed from parental custody. [Citation.] The record here fully supports the conclusion [the father] continued the significant parent-child relationship despite the lack of day-to-day contact with S.B. after she was removed from his care. [Citation.]" (*S.B.*, at p. 299, italics omitted.) Because "the only reasonable inference [was] that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]," the juvenile court erred when it found the beneficial relationship exception did not apply and terminated parental rights. (*Id.* at p. 301.)

In *Jerome D., supra,* 84 Cal.App.4th 1200, the nearly nine-year-old child had lived with his mother for the first six and one-half years of his life. The child expressed a desire to live with his mother, had been having unsupervised overnight visits with her, and had no other mother figure in his life. (*Id.* at 1207.) The child "seemed lonely, sad, and . . . 'the odd child out' " in his placement. (*Id.* at 1206.) Further, a bonding study showed the positive effect of the interaction between Jerome and his mother and that severance of the relationship would be detrimental to Jerome. (*Id.* at p. 1207.) The reviewing court found insufficient evidence to support a finding that the mother did not meet her burden of showing a beneficial parent-child relationship. (*Id.* at pp. 1208–1209.)

Here, in contrast to the facts presented in *S.B.* and *Jerome D.*, Father has not addressed the issues underlying the dependency, he never progressed beyond supervised visitation, no concerns have been expressed regarding Andrea's placement with the maternal aunt, and no expert testimony has been given regarding the positive effect of a continuing relationship with Father.

The facts of this case are more closely analogous to those presented in *Jasmine D., supra*, 78 Cal.App.4th 1339. In that case, the mother had visited consistently with Jasmine, who was three years old at the time of the hearing. During visits, mother was nurturing and provided the child with food, guidance, and discipline. However, the mother never progressed from supervised to unsupervised visits and had complied with

11

virtually none of the requirements of her reunification plan.  (*Id.* at pp. 1343–1344.)  In considering whether the juvenile court had abused its discretion, in finding the beneficial relationship exception inapplicable, the reviewing court observed:  "The exception . . . must be considered in view of the legislative preference for adoption when reunification efforts have failed.  [Citation.]  So viewed, the exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent.  The [beneficial relationship] exception is not a mechanism for the parent to escape the consequences of having failed to reunify."  (*Id.* at p. 1348.)  The reviewing court concluded that the juvenile court had not abused its discretion, stating:  "The benefit of a stable, permanent adoptive home for Jasmine clearly outweighed the benefit of a continued relationship with [the mother], who despite her successful visitation record had made no steps toward overcoming the problems leading to Jasmine's dependency . . . ."  (*Id.* at pp. 1351–1352.)

The juvenile court's determination, that the benefits Andrea would receive from a continued relationship with Father did not outweigh the benefits of permanence and stability Andrea would gain through adoption, is supported by substantial evidence and does not constitute an abuse of discretion.  "[F]requent and loving contact" between a parent and child simply is not enough.  (*In re Beatrice M., supra*, 29 Cal.App.4th at pp. 1418–1419.)

### III.    DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

SIMONS, J.